AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Western District of Washington

```
┌─────────────────────────────────┐
│  ____ FILED  ____ LODGED         │
│       ____ RECEIVED              │
│       MAY 22 2018                │
│      CLERK U.S. DISTRICT COURT   │
│ WESTERN DISTRICT OF WASHINGTON AT TACOMA │
│ BY                        DEPUTY │
└─────────────────────────────────┘
```

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )

215961 US Hwy 101, Port Angeles, Washington & 1215 )
US Hwy 101, Trailer 101, Port Angeles, Washington, )
more particularly described in Attachments A1 & A2 )

Case No. MJ18- 5126

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachments A1 and A2,

located in the _____ Western _____ District of _____ Washington _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841(a)(1), 843(b), 846, 952, and 18 USC 922(g)(1), 924(c), 1956, and 1957 | Drug trafficking conspiracy and related offenses, money laundering and related offenses. |

The application is based on these facts:

See Attached Affidavit of DEA Special Agent Samuel Landis.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Samuel Landis, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 5/22/2018

*Judge's signature*

City and state: Tacoma, Washington

David W. Christel, United States Magistrate Judge
*Printed name and title*

1

**AFFIDAVIT**

2

STATE OF WASHINGTON        )

3                                                            )        ss

4        COUNTY OF PIERCE        )

5

6        Samuel Landis, being first duly sworn on oath, deposes and says:

7        **I.        AFFIANT BACKGROUND AND EXPERIENCE**

8        1.        I am an "investigative or law enforcement officer of the United States"

9        within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of

10       the United States who is empowered by law to conduct investigations of, and to make

11       arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

12       2.        I am a Special Agent (SA) with the Drug Enforcement Administration

13       (DEA), and have been so employed since March of 2016.  I am currently assigned to the

14       Seattle Field Division, Tacoma Resident Office.  Prior to my employment with the DEA,

15       I was employed as a Border Patrol Agent from November 2009 to March 2016.

16       3.        I received formal training at the DEA Basic Agent Training Academy in

17       Quantico, Virginia.  The 22-week training included comprehensive, formalized

18       instruction in, among other things:  basic narcotic investigations, drug identification and

19       detection, familiarization with United States narcotics laws, financial investigations and

20       money laundering, identification and seizure of drug-related assets, organized crime

21       investigations, physical and electronic surveillance, and undercover operations.  In

22       addition to Basic Agent Training, I have completed Money Laundering Training, Traps

23       and Concealed Compartments Training, and other various courses that have familiarized

24       me with investigations of drug trafficking organizations, methods of importation and

25       distribution of controlled substances, and financial investigations.

26       4.        During the course of my law enforcement career, I have been involved in

27       investigations of narcotics offenses, including offenses involved in this current

28       investigation.  I have participated in criminal investigations of drug-trafficking

AFFIDAVIT OF SA SAMUEL LANDIS - 1

1 | organizations (DTOs), ranging from street-level dealers to larger dealers, including

2 | Mexican-based DTOs.  These investigations have included the unlawful importation,

3 | possession with intent to distribute, and distribution of controlled substances; the related

4 | laundering of monetary instruments; the conducting of monetary transactions involving

5 | the proceeds of specified unlawful activities; and conspiracies associated with these

6 | offenses.

7 | 5. As noted above, prior to my employment with the DEA, I was employed

8 | with the United States Border Patrol as a Border Patrol Agent for more than six years.

9 | During my time as a Border Patrol Agent, I intercepted narcotics from narcotics

10 | traffickers/smugglers as part of my regular duties.  Furthermore, I assisted the DEA and

11 | Homeland Security Investigations with mid-and upper-level drug investigations in at least

12 | fifteen cases.  My experience as a Border Patrol Agent familiarized me with the methods

13 | used by narcotics traffickers/smugglers to transport narcotics to transport narcotics,

14 | firearms, and bulk currency into and out of the United States.

15 | **II.      PURPOSE OF AFFIDAVIT**

16 | 6. This Affidavit is submitted in support of an application to search the

17 | following two locations, as further described in Attachments A1 and A2, for evidence,

18 | fruits and instrumentalities of the crimes of distribution and possession with intent to

19 | distribute controlled substances, in violation of Title 21, United States Code, Section

20 | 841(a)(1), and conspiracy to commit these offenses in violation of Title 21, United States

21 | Code, Section 846; use of a communications facility in furtherance of a felony drug

22 | offense in violation of Title 21, United States Code, Section 843(b); felon in possession

23 | of a firearm and possession of a firearm in furtherance of a drug trafficking crime, in

24 | violation of Title 18, United States Code, Sections 922(g)(1) and 924(c); and laundering

25 | of monetary instruments and conspiracy to commit money laundering, in violation of

26 | Title 18, United States Code, Sections 1956 and 1957, as further described in Attachment

27 | B.  The locations agents are requesting authorization to search are identified in bold font

28 | throughout this Affidavit:

AFFIDAVIT OF SA SAMUEL LANDIS - 2

1    a.  Primary residence of Nicolas OROZCO CRUZ and Elizabeth Ann

2 MCKEAN, located at **215961 US Hwy 101, Port Angeles, Washington 98363**; and

3    b.  Secondary residence of Nicolas OROZCO CRUZ and suspected

4 drug stash house, located at **1215 US Hwy 101, Trailer 101, Port Angeles, Washington**

5 **98363**.

6      **III.  CONFIDENTIAL SOURCES**

7 ***Confidential Source 1***

8   7.  In mid-June of 2017, I received information from a confidential source

9 (CS1) regarding Nicolas OROZCO CRUZ's drug trafficking activities.  CS1 contacted

10 law enforcement expressing his/her knowledge regarding suspected drug trafficking

11 activities at **215961 US Hwy 101, Port Angeles, Washington**.  CS1 agreed to cooperate

12 with law enforcement by introducing a DEA undercover agent (UC) to Elizabeth Ann

13 MCKEAN, whom CS1 believed to be involved in those drug trafficking activities.  CS1

14 agreed to do this out of his/her concern for the public's safety.  CS1 does not have a

15 criminal history, however, CS1 admitted to having used methamphetamine in the past.

16 At the time I dealt with CS1, she/he indicated she/he no longer used illegal narcotics and

17 was approximately one year removed from his/her previous methamphetamine use.

18 ***Confidential Source 2***

19   8.  In January of 2018, Olympic Peninsula Narcotics Enforcement Team

20 (OPNET) detectives interviewed a Confidential Source (CS2) at a secure location in

21 Clallam County.  OPNET detectives conducted this interview because they had received

22 information from multiple suspected drug users that CS2 supplied controlled substances,

23 to include heroin and methamphetamine, to persons in the Clallam County area.  When

24 OPNET detectives contacted CS2, he/she agreed to provide information to OPNET.  CS2

25 admitted to having a recent history of selling heroin and methamphetamine to people

26 throughout Clallam County.

27   9.  CS2 admitted to having a history of controlled substance use and

28 distribution, which gave CS2 an understanding of the controlled substance market in

1   Clallam County, Washington.  During the course of CS2's cooperation with law

2   enforcement, law enforcement determined CS2 to be reliable and to provide

3   trustworthy/timely information.  CS2 has three drug-related felony convictions, four

4   gross misdemeanor convictions that are unrelated to either a drug trafficking crime or a

5   crime of dishonesty, and one misdemeanor conviction that is unrelated to either a drug

6   trafficking crime or a crime of dishonesty.  CS2 is cooperating with law enforcement in

7   the hope of a sentence reduction.

8                    **IV.   INVESTIGATION SUMMARY**

9          9.      The facts set forth in this Affidavit arise from my personal and direct

10   participation in this investigation, my experience and training, my conversations with

11   witnesses and other law enforcement personnel participating in this investigation, and my

12   review of documents and reports.  This Affidavit does not include each and every fact

13   known to me concerning this investigation.  Instead, I have set forth only the facts I

14   believe are necessary to establish probable cause for the issuance of the requested

15   warrants.

16          10.     I have been investigating a drug trafficking organization (DTO) that

17   consists of multiple drug distributors who have a common source of supply, believed to

18   be Nicholas OROZCO CRUZ.  OROZCO CRUZ's DTO operates in the Olympic

19   Peninsula area, where I believe its members are distributing large amounts of Mexican-

20   produced methamphetamine and heroin.  The Olympic Peninsula community is small,

21   rural and confined.  Based on the geography, CS debriefings, and many hours of physical

22   and electronic surveillance, agents believe that OROZCO CRUZ and his DTO are the

23   primary drug suppliers and distributors on the Olympic Peninsula.

24          11.     This DTO is hypersensitive to police presence, which, in addition to the

25   remote location, makes law enforcement actions difficult.  Despite the aforementioned

26   barriers, agents successfully introduced an Undercover Agent (UC) to the DTO.

27   Additionally, agents have identified multiple associates and suspected co-conspirators

28   believed to be involved in the DTO, including Elizabeth MCKEAN, Jessica

1  CHRISTMAN, John Killins, and Daniel Allen Percival.  During this investigation, agents

2  conducted controlled purchases of narcotics from MCKEAN using the UC, and from

3  OROZCO CRUZ and CHRISTMAN using CS2, and conducted many hours of physical

4  and electronic surveillance.

5       12.    In late March 2017, I arrested Daniel Allen Percival on drug and firearms

6  charges, following the execution of two federal search warrants at residences in Sequim

7  and Port Angeles, Washington.  The warrants led to seizures of 14 firearms (three of

8  which were stolen), more than $10,000 in US currency, and distribution quantities of

9  methamphetamine, heroin, cocaine, and MDMA.  During physical surveillance of

10  Percival over the course of the investigation, and prior to execution of the warrants,

11  agents observed OROZCO CRUZ making multiple short stay stops at locations where

12  Percival was residing.  This is a behavior I recognize, based on my training and

13  experience, as one commonly exhibited by a drug dealer making a drop-off or a buy of

14  drugs.  Additionally, after those short stay stops, agents were able to observe increased

15  human traffic at Percival's residences, which is consistent with a drug dealer resupplied

16  recently with drugs.  Percival was convicted of drug trafficking and firearms crimes and

17  is incarcerated at FCI Sheridan, with a projected release date of January 27, 2023.

18  ***OROZCO CRUZ's Suspected Drug Trafficking in June 2017***

19       13.    In mid-June of 2017, agents conducting physical surveillance observed

20  OROZCO CRUZ driving a 2000 white Toyota Solara bearing Washington license

21  BBR3745 (TV2) from **215961 US Hwy 101, Port Angeles, Washington**, to a Safeway

22  in Port Angeles, Washington.  Upon arriving at Safeway, OROZCO CRUZ got out of

23  TV2 with a small child and entered the store.  OROZCO CRUZ bought a few food items

24  and subsequently sat down at a table near the entrance/exit of the store.  Shortly after he

25  sat, agents observed OROZCO CRUZ meeting with an unknown white male (UM) who

26  was wearing a ball cap, blue jeans, and a jean jacket.  The UM sat next to OROZCO

27  CRUZ at the table, where agents saw the two making a quick hand-to-hand exchange,

28  which is a common drug/money exchange method amongst members of the drug

AFFIDAVIT OF SA SAMUEL LANDIS - 5

1    community.  Immediately following the exchange, the UM left the table.  During this

2    particular event, agents had observed OROZCO CRUZ coming directly from **215961 US**

3    **Hwy 101, Port Angeles, Washington** to the Safeway in order to conduct the suspected

4    drug transaction, which leads me to believe that the drugs provided for this suspected

5    transaction came from **215961 US Hwy 101, Port Angeles, Washington**.

6    ***Controlled Buys from MCKEAN***

7         14.    In mid-June of 2017, I received information from CS1 regarding OROZCO

8    CRUZ's drug trafficking activities.  CS1 contacted law enforcement expressing his/her

9    knowledge regarding suspected drug trafficking activities at **215961 US Hwy 101, Port**

10   **Angeles, Washington**.  CS1 agreed to cooperate with law enforcement by making a

11   connection between a DEA UC and MCKEAN, whom CS1 believed to be involved in

12   those drug trafficking activities.

13        15.    According to CS1, OROZCO CRUZ made multiple trips per week into the

14   "city" (which is believed to be a place closer to the Seattle-Tacoma metro areas than the

15   Olympic Peninsula).  OROZCO CRUZ supposedly made these trips in order to purchase

16   more methamphetamine and heroin for distribution in his area.  According to CS1,

17   OROZCO CRUZ was usually gone for about four hours.  Additionally, CS1 stated that

18   OROZCO CRUZ and MCKEAN lived at **215961 US Hwy 101, Port Angeles,**

19   **Washington**.  CS1 further described **215961 US Hwy 101, Port Angeles, Washington**,

20   as a place where OROZCO CRUZ and MCKEAN used and hid drugs.

21        16.    After CS1 facilitated the introduction of the UC to MCKEAN, the UC

22   contacted MCKEAN at phone number 360-640-0564[1] (Target Telephone 1 or TT1) to

23   arrange for the controlled purchase(s) of methamphetamine from MCKEAN and/or the

24   OROZCO CRUZ DTO.

25

26

27   _____

28   [1] 360-640-9730 was previously and incorrectly mentioned in past affidavits.  360-640-0564 is the correct number for TT1 and will be used as such going forward

AFFIDAVIT OF SA SAMUEL LANDIS - 6

17.    On June 28, 2017, agents conducted a controlled purchase of a quarter-pound of methamphetamine for $1,400 in Port Angeles, Washington, from MCKEAN. Prior to the controlled buy, the UC communicated with MCKEAN, via text messaging to TT1, and coordinated a meeting with her at "Granny's Café," located at 235471 US Hwy 101, Port Angeles, Washington.  Surveillance units saw MCKEAN arrive at Granny's Café, get some ice cream, and then leave the area driving westbound on US Hwy 101, where she subsequently parked at a turnout just west of Granny's Café, off US Hwy 101. At about the same time, agents observed the UC arrive at MCKEAN's location and MCKEAN get into the UC's vehicle.  Via the UC's electronic equipment, the monitoring agent could hear MCKEAN saying that she just wanted to drive around for a bit.

18.    According to the UC, MCKEAN told him/her that she did not trust this whole side of the lake (the east side of Crescent Lake).  The UC asked MCKEAN to show him/her the drugs, or at least describe them as the UC drove.   MCKEAN said there were essentially two batches of "crystal meth" in the black plastic bag she had just given to the UC.  According to the UC, she went on to say that inside the black plastic bag was a white sock that actually contained two separate bags (or "batches," as MCKEAN put it) of crystal meth.  The UC presumed each bag was two ounces in weight, for a total of four ounces as he/she had ordered, based on the size of each bag.  The UC asked if MCKEAN had gotten the batches of drugs from different people.  MCKEAN said all of the drugs were from "us," which the UC (and other participating agents) believed to mean MCKEAN and her boyfriend OROZCO CRUZ, based on other information gathered during the course of the investigation.

19.    MCKEAN went on to tell the UC she typically conducts drug transactions right outside her [and OROZCO CRUZ's] house, which agents believed to be **215961 US Hwy 101, Port Angeles, Washington**.  MCKEAN suggested she and the UC could eventually just use her house (which she said was very close to the highway turnout they were currently sitting at) to conduct drug transactions, once their relationship had been better established.

AFFIDAVIT OF SA SAMUEL LANDIS - 7

20.     After the controlled purchase was completed, agents followed the UC to a predetermined neutral location and inspected the contents of a black plastic bag MCKEAN had given the UC.  When agents removed the contents of a sock inside the black plastic bag, there appeared to be two separate plastic baggies that contained suspected methamphetamine.  Later that same day, agents weighed and field-tested the contents of the two separate plastic baggies.  The results were presumptive positive for methamphetamine with a weight of 178.9 gross grams.

21.     On July 12, 2017, agents conducted a controlled purchase of a half-pound of methamphetamine for $2,800 in Port Angeles, Washington, from MCKEAN.  Agents set up surveillance in the area of MCKEAN's residence at **215961 US Hwy 101, Port Angeles, Washington**, and followed MCKEAN from the residence to the prearranged meeting location with the UC.  MCKEAN met with the UC and gave him/her a box.  The UC gave MCKEAN $2,800, and after the UC and MCKEAN completed the suspected drug transaction, the two parted ways.  Later that same day, agents weighed and field-tested the contents of the box (a crystal substance wrapped in plastic).  The results were presumptive positive for methamphetamine with a weight of 260.6 gross grams.

*OROZCO CRUZ Travels to Renton*

22.     On June 20, 2017, agents obtained authorization from the Superior Court of Washington for Pierce County to install and monitor an electronic GPS tracking device on TV2 for 60 days.  Agents installed the GPS tracking device on TV2 that same day. That period of authorized tracking expired on August 19, 2017.

23.     On August 1, 2017, I observed (via GPS tracking) TV2 drive from **215961 US Hwy 101, Port Angeles, Washington**, to the Hood Canal Bridge area and then further south.  Throughout June and July of 2017, the GPS tracking of TV2 showed the vehicle, on multiple occasions, traveling from **215961 US Hwy 101, Port Angeles, Washington**, to 3901 NE 7th St, Renton, Washington for short visits.  According to the GPS tracker data, TV2 did not usually leave the Sequim and Port Angeles, Washington areas unless the vehicle was traveling to 3901 NE 7th St, Renton, Washington.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

24.     In anticipation of OROZCO CRUZ traveling to 3901 NE 7th St, Renton, agents set up surveillance along the Interstate-5 corridor (I-5) to intercept and follow TV2. Agents eventually observed OROZCO CRUZ driving northbound on I-5. Agents verified OROZCO CRUZ was the driver of TV2 and saw him wearing a black ball cap, black t-shirt, and blue jeans. Agents then followed OROZCO CRUZ to Renton.

25.     Agents observed OROZCO CRUZ drive to and park in the driveway at 3901 NE 7th St, Renton, get out of TV2, and meet with a bearded, heavy-set, unknown Hispanic male. They both went into the residence briefly. When OROZCO CRUZ returned to TV2, agents observed him open the passenger side door and place an item in TV2, which I believe to have been his suspected resupply of drugs. Shortly after, OROZCO CRUZ got back in TV2 and began driving back in the direction of Port Angeles. As agents followed OROZCO CRUZ, I contacted OPNET detectives and coordinated with them to assume surveillance of OROZCO CRUZ when he arrived in the Jefferson County area.

26.     OPNET detectives acquired visual of TV2 traveling west on US Highway 101 in the Jefferson County area and began following it. OPNET detectives observed TV2 drive directly to 732 West 5th Street, Port Angeles, Washington and park in the driveway.  The detectives then saw OROZCO CRUZ walk into the residence. Within several minutes, an unknown female (UF) exited the residence with OROZCO CRUZ and they walked to TV2, where OROZCO CRUZ sat in the driver's seat and the UF sat in the front passenger seat. They both closed the car doors and remained in the vehicle for approximately one minute. OROZCO CRUZ and the UF exited TV2 and went back into the residence. A short while later, OPNET detectives observed two females exit the residence and get into a blue 2008 Chevrolet Aveo hatchback. A Department of Licensing (DOL) registration check for the license plate detectives observed affixed to the vehicle showed it registered to an individual with the initials H.M.C., whose full name I know but have not included in this Affidavit. OPNET detectives performed checks in a police database system and discovered that H.M.C. reported a domestic

AFFIDAVIT OF SA SAMUEL LANDIS - 9

1   assault in May of 2017 to the Sequim Police Department.  During that investigation,

2   H.M.C. stated to Sequim Officers that he/she was following an outpatient treatment

3   program and was using Suboxone.  Suboxone is a prescription medication used to assist

4   with opiate addictions.  H.M.C. also told Sequim officers that he/she had recently had a

5   drug relapse.

6       27.     Minutes after the females left in the vehicle registered to H.M.C., OPNET

7   detectives observed OROZCO CRUZ leaving 732 West 5th Street and driving directly to

8   718 West 5th Street, Port Angeles, Washington, where OROZCO CRUZ went into the

9   residence briefly and then returned to TV2.  After OROZCO CRUZ left 718 West 5th

10  Street, OPNET detectives drove by the residence via the alley and obtained the license

11  plate number of the vehicle in the driveway.  A DOL record check showed the vehicle as

12  being a red 2008 Ford Focus registered to an individual with the initials M.L.H., whose

13  full name I know but have not included in this Affidavit.  After receiving this

14  information, I conducted a check in a law enforcement database and discovered that

15  M.L.H. has a July 2011 conviction for possession of a controlled substance (heroin), a

16  class C felony.

17      28.     OPNET continued to follow OROZCO CRUZ and observed him drive to

18  an apartment complex on South C Street between West 15th and West 16th Streets in

19  Port Angeles.  OROZCO CRUZ parked on the west side of the building in a parking lot

20  for the apartment.  Within about 10 minutes, OROZCO CRUZ appeared from the

21  apartments on the north end and got into TV2.  OROZCO CRUZ then backed out of the

22  parking stall he was in, drove to the south side of the same parking lot, and pulled into a

23  different parking stall about eight stalls south.  OROZCO CRUZ remained in TV2 in this

24  stall for about three minutes, then backed out and left.  After his quick visit to the

25  apartment complex, agents believed OROZCO CRUZ was performing a "heat-check," a

26  common technique used by drug traffickers in order to detect for police presence.

27      29.     Minutes later, OROZCO CRUZ drove to and parked at the Safeway (110 E

28  3rd Street, Port Angeles) next to a black GMC pick-up truck, occupied by John Killins

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    and Jessica CHRISTMAN.  Agents recognized CHRISTMAN and Killins as associates

2    of Daniel Allen Percival who, as mentioned before, has been convicted of drug charges.

3    During the investigation of Percival, agents observed CHRISTMAN and Killins with

4    Percival for what agents believed to have been drug transactions.

5          30.    Upon arriving in the Safeway parking lot, OPNET detectives observed

6    CHRISTMAN get out of TV2 with a package in her left hand.  CHRISTMAN placed the

7    package, which appeared to be a plastic bag, into her truck.  From my experience, I know

8    that drugs are often packaged for retail distribution in plastic baggies or Ziploc bags.

9    CHRISTMAN then retrieved a different item from her truck and gave it to OROZCO

10    CRUZ.  The item CHRISTMAN gave to OROZCO CRUZ was white and appeared to be

11    a round plastic container with a lid.  Also from experience, I know drug traffickers to

12    place money in containers to conceal the contents.  Afterwards, CHRISTMAN went back

13    to her truck and OROZCO CRUZ left the parking lot.  CHRISTMAN, Killins, and a

14    younger unknown male left the area minutes later.

15          31.    Based on training and experience, police reports from locations OROZCO

16    CRUZ visited, and the criminal history of persons OROZCO CRUZ met with, agents

17    believe that when OROZCO CRUZ traveled to 3901 NE 7th Street, Renton, on August 1,

18    2017, he acquired a supply of drugs.  After OROZCO CRUZ picked up his suspected

19    drug supply, agents believe he made the short stay visits described above to distribute his

20    suspected drug supply.

21          32.    After OROZCO CRUZ completed his suspected drug resupply and

22    subsequent drug route, GPS tracker data for TV2 showed OROZCO CRUZ arrive and

23    stay overnight at **215961 US Hwy 101, Port Angeles, Washington**.

24    ***Surveillance of OROZCO CRUZ on October 17, 2017***

25          33.    On October 17, 2017, agents observed (via physical surveillance)

26    OROZCO CRUZ driving TV2 away from **215961 US Hwy 101, Port Angeles,**

27    **Washington**.  From there, agents followed OROZCO CRUZ to the "Welcome Inn RV

28    Park" which is addressed at 1215 US Hwy 101, Port Angeles, Washington.  Throughout

1  the RV Park, each mobile home is assigned a lot number, giving the homes a specific

2  address.  The number is clearly visible on the home itself or somewhere nearby.  The

3  particular home where OROZCO CRUZ parked was marked with the number "101"

4  (**1215 US Hwy 101, Trailer 101, Port Angeles, Washington**).  Agents observed

5  OROZCO CRUZ stay at this residence for approximately five minutes.  During the span

6  of this investigation, through physical and electronic surveillance, agents have observed

7  OROZCO CRUZ making numerous short stay stops at **1215 US Hwy 101, Trailer 101,**

8  **Port Angeles, Washington**, which is consistent with the behavior of a drug trafficker

9  making quick drug/money pick-ups and/or drop-offs.  Furthermore, during each physical

10  surveillance operation, agents observed OROZCO CRUZ making short stay stops at **1215**

11  **US Hwy 101, Trailer 101, Port Angeles, Washington** before and/or after he made a

12  suspected drug transaction.  Based on the these observations and the training and

13  experience of agents, agents believe **1215 US Hwy 101, Trailer 101, Port Angeles,**

14  **Washington** is a suspected drug/money stash house.

15         34.     After OROZCO CRUZ's quick stop at **1215 US Hwy 101, Trailer 101,**

16  **Port Angeles, Washington**, agents saw him drive to 718 West 5th Street, Port Angeles,

17  Washington, where agents believe M.L.H. lives.  Agents watched OROZCO CRUZ go

18  into the house and return to TV2 several minutes later.  As stated earlier in this Affidavit,

19  M.L.H. has a July 2011 conviction for possession of a controlled substance (heroin), a

20  class C felony.  As agents continued to follow OROZCO CRUZ, he began to make a

21  series of driving maneuvers and turns, which agents believed to "heat-checks," a common

22  technique used by drug traffickers in order to detect for police presence.  Throughout the

23  span of this investigation, through physical and electronic surveillance, agents have

24  observed OROZCO CRUZ making numerous short stay stops at this residence, which is

25  associated with the behavior(s) of a drug trafficker making quick drug transactions.

26  ***January 2018 Statements from CS2***

27         35.     During the span of November 2017 through January 2018, agents were not

28  able to locate OROZCO CRUZ's whereabouts.  It became apparent to agents that

AFFIDAVIT OF SA SAMUEL LANDIS - 12

1 || OROZCO CRUZ may have discontinued using TV2, started using another vehicle, or

2 || changed his entire routine.

3      36.      In January of 2018, OPNET detectives interviewed CS2 at a secure location

4 || in Clallam County.  CS2 admitted to having a recent history of selling heroin and

5 || methamphetamine to people throughout Clallam County.  CS2 said that his/her heroin

6 || source of supply was a person who went by the moniker "NIKO," a known nickname for

7 || OROZCO CRUZ.  CS2 also mentioned "NIKO" as being in a in a dating relationship

8 || with a female named Elizabeth.  Additionally, CS2 said that "NIKO" has an adult son

9 || and a four-year-old daughter.  Agents know OROZCO CRUZ has a girlfriend named

10 || Elizabeth [MCKEAN] and two children.  Therefore, agents believe that CS2 was talking

11 || about OROZCO CRUZ (NIKO).

12      37.      CS2 said that he/she regularly purchased a half-pound of heroin from

13 || OROZCO CRUZ for around $4,500.  In order to facilitate the drug orders, CS2 contacted

14 || OROZCO CRUZ via cellular phone.  CS2 said that OROZCO CRUZ was paranoid about

15 || phone usage, so phone calls were "short and sweet" and text messages did not mention

16 || controlled substances.  Instead, the messages would contain statements like, "Can you

17 || come see me," which would indicate a likely future drug transaction.  During past

18 || meetings with OROZCO CRUZ, CS2 noticed that OROZCO CRUZ was careful not to

19 || have anyone else in the area when conducting a drug transaction.

20      38.      CS2 also gave OPNET detectives names and addresses of other persons to

21 || whom OROZCO CRUZ sold drugs.  During many hours of physical and electronic

22 || surveillance, agents have observed OROZCO CRUZ at each of the locations given by

23 || CS2, and detectives and agents were familiar with the names CS2 provided as suspected

24 || drug customers of OROZCO CRUZ's.

25 || *Surveillance of OROZCO CRUZ in February 2018*

26      39.      In early February of 2018, agents conducted surveillance and saw TV2

27 || traveling east on US Highway 101 around Lake Crescent, which is near **215961 US Hwy**

28 || **101, Port Angeles, Washington**.  Agents identified OROZCO CRUZ as the driver of

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  TV2 when he stopped at 71 Benson Road, Port Angeles, Washington.  Agents know this

2  address to be a daily quick stop for OROZCO CRUZ from information gathered through

3  past surveillance operations, electronic surveillance, and information provided by CS2.

4        40.      When OROZCO CRUZ left 71 Benson Road, Port Angeles, agents saw

5  TV2 travel to a residence in the alley between West 13th and West 14th from C Street in

6  Port Angeles, Washington.  After a few minutes, TV2 left and traveled to the Welcome

7  Inn RV Park where I believe OROZCO CRUZ stopped at **1215 US Hwy 101, Trailer**

8  **101, Port Angeles, Washington**, to pick up enough drugs to distribute to his local

9  clients.  About 10 minutes later, TV2 left the Welcome Inn RV Park and drove towards

10  the Safeway in Port Angeles, Washington.  Agents saw TV2 near the Safeway (110 E 3rd

11  Street, Port Angeles), parking behind a Nissan Rouge.  Agents saw a female get out of

12  the Rouge and enter the passenger side of TV2.  A DOL check revealed the vehicle as

13  registered to S.H. and D.H., whose full names I know but have not included in this

14  Affidavit.  Law enforcement knows an individual named H.H. to be the daughter of D.H.

15  According to law enforcement records, the residence at which S.H., D.H., and H.H. have

16  vehicles registered has been associated with medical calls for the purposes of aiding in

17  heroin overdoses.

18        41.      After a few minutes, the female exited TV2 and returned to the Rouge.

19  OROZCO CRUZ then drove TV2 to the nearby Safeway and parked.  Moments later, a

20  black 1999 GMC pickup, bearing Washington license B12650X, parked in the Safeway

21  lot.  As described above, this vehicle is registered to John Killins.  OROZCO CRUZ then

22  drove TV2 over to the black GMC pickup, which was occupied by Killins and

23  CHRISTMAN.  CHRISTMAN exited the truck and got into the passenger seat of TV2

24  for what agents believe to be a drug transaction with OROZCO CRUZ.  After about

25  seven minutes, CHRISTMAN got out of TV2.

26        42.      After meeting with CHRISTMAN, OROZCO CRUZ drove TV2 towards

27  the intersection of West 12th Street and South N. Street, Port Angeles, Washington.

28  Investigators saw TV2 driving down the 2100 block of West 12th Street, which is a dead

1   end.  While afoot, OPNET detectives approached 2103 West 12th Street and saw a white

2   male standing in the driveway, talking on a cell phone.  The male went inside the

3   residence after a couple of minutes.  OPNET then saw TV2 parked in the driveway of

4   2103 West 12th Street along with two other vehicles.  A short time later, OPNET

5   detectives saw OROZCO CRUZ exit the residence at 2103 West 12th Street.

6       43.   On January 25, 2018, OPNET detectives had received a phone call from a

7   concerned citizen who lives on the 2100 block of West 12th Street.  The concerned

8   citizen stated that for the past six months, there had been many different people coming

9   and going at the residence located at 2103 West 12th Street.  The concerned citizen

10  described individuals as walking, riding bicycles, or driving to the house and leaving

11  within one or two minutes' time.  The concerned citizen also told OPNET detectives that

12  the neighbors were complaining that they had recently been finding "little baggies" on

13  their lawns.  I know that drug traffickers commonly use "plastic baggies" to package

14  drugs.

15  *Controlled Buys from OROZCO CRUZ and CHRISTMAN*

16      44.   Through the months of April and May of 2018, DEA agents, with support

17  from OPNET detectives, conducted four controlled buys from OROZCO CRUZ.  For

18  each of the controlled buys, agents utilized CS2 who, under the direction and control of

19  OPNET Detective (Det.) Jeff Pickrell and I, coordinated the purchases through OROZCO

20  CRUZ's intermediary, CHRISTMAN.  Prior to and after each controlled purchase, Det.

21  Pickrell and I met with CS2 at a predetermined neutral location and searched his/her

22  vehicle and person for contraband, e.g., firearms/drugs/bulk cash.  Each search yielded

23  negative results.  I also gave CS2 an electronic monitoring device (EMD) for each

24  controlled buy to record audio and video during the respective controlled purchase.

25      45.   Following each controlled buy, Det. Pickrell and I took possession of the

26  suspected heroin and processed it as evidence.  Each substance obtained during the

27  respective controlled purchases tested presumptive positive for heroin.  The first

28  controlled buy was for one ounce of heroin, and the remaining three controlled buys were

1   for two ounces of heroin each.  The total amount of heroin purchased from OROZCO

2   CRUZ and CHRISTMAN during these four controlled buys is 297.8 gross grams.

3   ***First Controlled Buy from OROZCO CRUZ and CHRISTMAN***

4       46.    The first controlled purchase took place in the first week of April 2018,

5   when late in the evening CHRISTMAN informed CS2 that OROZCO CRUZ had set the

6   suspected one ounce heroin deal in Port Angeles, Washington.  Det. Pickrell and I

7   instructed CS2 to acknowledge the information, and inform CHRISTMAN she/he would

8   drive to the agreed upon location.  Simultaneously, surveillance units moved into position

9   around that location.  I provided Det. Pickrell with $1,200 in Officially Authorized Funds

10  (i.e., buy money), and he gave the buy money to CS2, prior to CS2's leaving to meet

11  CHRISTMAN.

12      47.    Det. Pickrell and I followed CS2 to the deal location until Task Force

13  Officer (TFO) Ryan Hamilton observed CS2 arrive and park at the agreed upon deal

14  location.  Within a few minutes, TFO Hamilton then saw CHRISTMAN arrive and pull

15  into the same area.  TFO Hamilton observed CHRISTMAN driving the same 1999 black

16  GMC Sierra registered to Killins that investigators have seen on multiple occasions

17  throughout the investigation.  TFO Hamilton saw a male passenger in the Sierra when it

18  arrived.

19      48.    About five minutes later, TFO Hamilton observed CHRISTMAN exit the

20  Sierra and walk over to meet with CS2.  CS2 and CHRISTMAN proceeded to make

21  small talk about their personal vehicles, discuss OROZCO CRUZ's ability to get

22  methamphetamine and cocaine, and exchange the buy money for the deal.  After their

23  discussion and money exchange, TFO Hamilton observed CHRISTMAN walk away

24  from CS2, walk back to the Sierra, and drive to a nearby parking lot.  SA Steven Meyer

25  confirmed the Sierra parked in the middle of the parking lot.

26      49.    Moments later, surveillance units saw OROZCO CRUZ driving into Port

27  Angeles, Washington.  He was driving a white Ford Ranger, bearing Washington license

28  C96507K, registered to OROZCO CRUZ at 1205 South Forks Avenue, Forks,

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   Washington (TV3).  SA Matt Musselwhite observed TV3 approach the area where

2   CHRISTMAN had been waiting.  SA Meyer watched OROZCO CRUZ park TV3

3   adjacent to the Sierra.  CHRISTMAN exited the Sierra, moved to the passenger side door

4   of TV3, and got in. Simultaneously, the male passenger in the Sierra got out, moved to

5   the driver's side, and got in.  He was wearing a dark shirt and pants, and had a long dark

6   beard.  SA Meyer compared the man to a DOL photo of John Killins, and confirmed the

7   man matched the photo.

8       50.    Group Supervisor (GS) Lance Lehnhoff then observed the Sierra drive to

9   the northwest area of the deal location.  TV3, with CHRISTMAN inside, remained in the

10  middle of the parking lot, where I believed CHRISTMAN obtained the heroin for CS2

11  from OROZCO CRUZ.  Minutes later, SA Meyer then observed CHRISTMAN exit TV3,

12  and walk back to where the Sierra was parked.  Shortly thereafter, an unidentified male

13  got into OROZCO CRUZ's front passenger seat, and TV3 left the area.  Simultaneously,

14  SA Meyer observed CHRISTMAN walk from the Sierra through the parking lot and

15  reunite with CS2.  TFO Hamilton confirmed CHRISTMAN met with CS2.  Through the

16  EMD, I could hear and see CHRISTMAN weighing the suspected heroin I believe she

17  obtained from OROZCO CRUZ when meeting in TV3 earlier.  After a few minutes, TFO

18  Hamilton observed CHRISTMAN walk away from CS2 to the Sierra, and enter the

19  passenger side.  Shortly thereafter, CHRISTMAN and Killins left the area.

20      51.    CS2 departed and Det. Pickrell and I followed him/her to a predetermined

21  location, where he/she turned over the suspected one ounce of heroin and the remaining

22  buy money ($95.00) not used during the purchase.  During an interview with CS2 after

23  the controlled buy, he/she provided me with information that confirmed what I heard over

24  the EMD.  CS2 explained that when CHRISTMAN met with him/her after CHRISTMAN

25  had gone to OROZCO CRUZ's vehicle, CHRISTMAN had a large piece of suspected

26  heroin.  When CHRISTMAN weighed it out, she broke off multiple pieces to give CS2

27  and told CS2 that OROZCO CRUZ's heroin was really good.  CHRISTMAN went on to

28  describe the wholesale price of the suspected heroin and said OROZCO CRUZ was able

1   to purchase it for $950 an ounce.  CHRISTMAN also mentioned that she was with her

2   "boyfriend" that night, whom agents had already identified as Killins.  CS2 also knows

3   CHRISTMAN to be in a romantic relationship with Killins.

4   ***Second Controlled Buy from OROZCO CRUZ and CHRISTMAN***

5       52.    The second controlled purchase took place during the third week of April

6   2018, when during the late evening CHRISTMAN informed CS2 that OROZCO CRUZ

7   had set the two-ounce heroin deal for the same location in Port Angeles, Washington at

8   which the first controlled buy had taken place.  Det. Pickrell and I instructed CS2 to

9   acknowledge the information, and inform CHRISTMAN she/he would drive to the

10   location CHRISTMAN described.  Simultaneously, surveillance units moved into

11   position around that location.  I provided Det. Pickrell with $2,200 in buy money, which

12   he gave to CS2.

13       53.    Det. Pickrell and I followed CS2 to the deal location until OPNET

14   detectives observed CS2 arrive at the agreed upon deal location and park near

15   CHRISTMAN and Killins, who were both in the 1999 black GMC Sierra.  Subsequently,

16   Resident Agent in Charge (RAC) Ian McKenzie saw CHRISTMAN meeting with CS2.

17   Over the EMD I could hear the two counting the buy money.

18       54.    About ten minutes later, OPNET Sergeant (Sgt.) Tom Kuch observed

19   CHRISTMAN walk away from CS2 and get into a blue 2003 Toyota Corolla Matrix that,

20   according to RAC McKenzie, was occupied by one white female.  DOL records show the

21   vehicle as being registered to C.B. and T.B. at an address in Port Angeles; I know their

22   full names but have not included them in this Affidavit.  After looking at T.B.'s DOL

23   photograph, RAC McKenzie believed the photo to be consistent with the person he saw

24   in the blue Toyota.  While CHRISTMAN was in the blue Toyota, I called CS2 on the

25   phone and asked if he/she had given CHRISTMAN the $2,200 in buy money.  CS2 stated

26   that he/she gave CHRISTMAN the buy money in order to have CHRISTMAN buy two

27   ounces of heroin from OROZCO CRUZ.  I also inquired about the person in the blue

28   Toyota.  CS2 did not know who the person was, but said the person was ordering a "ball"

1   of heroin from OROZCO CRUZ and was also using CHRISTMAN as an intermediary.

2   Through training and experience, I know a "ball" to be drug code for an eighth of an

3   ounce of drugs.

4        55.    Sgt. Kuch then observed CHRISTMAN get out of the blue Toyota and

5   walk into a nearby market. SA Anthony DelVecchio and RAC McKenzie followed

6   CHRISTMAN into the store and saw her purchase grocery items. During this

7   surveillance and despite being at a distance, RAC McKenzie could smell a heavy heroin-

8   like aroma coming from CHRISTMAN. After completing her purchase at the market,

9   CHRISTMAN returned to the black GMC, as seen by RAC McKenzie and SA

10   DelVecchio.

11        56.    While performing surveillance in a separate area in anticipation of

12   OROZCO CRUZ's arrival, OPNET Sgt. John Keegan saw OROZCO CRUZ drive to the

13   "Welcome Inn RV Park" in TV2, where agents believe OROZCO CRUZ stopped at **1215**

14   **US Hwy 101, Trailer 101, Port Angeles, Washington**. Again, I believe this location to

15   be OROZCO CRUZ's "stash house," based on GPS tracker data and his regular stops at

16   this address before and after suspected drug sales.

17        57.    At about the same time, agents on surveillance observed CHRISTMAN and

18   Killins leaving the deal location in the black GMC. Agents followed CHRISTMAN and

19   Killins out of the lot. I could hear, via the EMD, CS2 and CHRISTMAN talking on the

20   phone about why CHRISTMAN had abruptly left the parking lot. CHRISTAMN told

21   CS2 that she had to drive to "his" location.

22        58.    Agents followed the GMC to where it parked in front of **1215 US Hwy**

23   **101, Trailer 101, Port Angeles, Washington**, as seen by Sgt. Keegan. As Sgt. Keegan

24   drove through the Welcome Inn lot, he saw OROZCO CRUZ in TV2 parked adjacent to

25   **1215 US Hwy 101, Trailer 101, Port Angeles, Washington**. I believe that when

26   CHRISTMAN went to visit OROZCO CRUZ at the Welcome Inn RV Park,

27   CHRISTMAN obtained the drugs for CS2 from OROZCO CRUZ.

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

59.    Agents on surveillance followed the GMC back to the deal location, where CS2 was waiting. From there, RAC McKenzie observed CHRISTMAN get out of the GMC and meet with CS2. I heard, via the EMD, the conversation between CS2 and CHRISTMAN. At one point, while CS2 and CHRISTMAN were talking, CS2 asked if "he" (OROZCO CRUZ) had "white and dark," referring to methamphetamine and heroin. CHRISTMAN's response was that "he had white," meaning OROZCO CRUZ, in addition to having heroin ("dark"), had methamphetamine as well. Furthermore, and based on the context of the conversation, I heard CHRISTMAN referring to "NIKO" [OROZCO CRUZ] as the person who she gets her drugs from. Shortly after meeting with CS2, CHRISTMAN then got in the blue Toyota for what agents believed to have been the aforementioned 1/8 ounce heroin transaction.

60.    After the meeting with CHRISTMAN, Det. Pickrell and I followed CS2 to a neutral location, where CS2 turned over the two ounces of suspected heroin to Det. Pickrell and me.

**Third Controlled Buy from OROZCO CRUZ and CHRISTMAN**

61.    The third controlled buy took place on a late evening during the fourth week of April 2018. Det. Pickrell and I met CS2 at a pre-determined location where, under the instruction of Det. Pickrell and me, CS2 called CHRISTMAN and asked her to coordinate a two-ounce heroin purchase from OROZCO CRUZ. CHRISTMAN told CS2 that she was about 10 minutes away from Port Angeles. Det. Pickrell and I instructed CS2 to acknowledge the information, and inform CHRISTMAN she/he would drive to the Port Angeles deal location. Simultaneously, surveillance units moved into position around that location. I provided Det. Pickrell with $2,200 in buy money, which he gave to CS2.

62.    Det. Pickrell and I followed CS2 to the deal location until TFO Robert Shaw observed CS2 arrive at the agreed upon deal location. Moments later, CHRISTMAN and Killins, who were both in the 1999 black GMC Sierra, arrived, as observed by RAC McKenzie. TFO Justin Chohrach then saw CHRISTMAN walk over

1    to and meet with CS2, where I could hear the two talking/counting the buy money over

2    the EMD.  Subsequently, TFO Chohrach saw CHRISTMAN walk away from CS2, get in

3    the Sierra and drive to a nearby parking lot.  OPNET Task Force Agent (TFA) Doug

4    Pyeatt saw CHRISTMAN walking into a nearby market, where TFO Shaw saw her

5    buying Ziploc baggies.

6         63.    Almost an hour later, TFA Pyeatt observed OROZCO CRUZ arrive at the

7    deal location in TV2.  Immediately upon OROZCO CRUZ's arrival, CHRISTMAN got

8    into TV2 and the two drove out of the lot.  Agents followed TV2, which drove down

9    nearby roads surrounding the deal location.  After a few minutes, I called CS2 on the

10   phone and asked where OROZCO CRUZ and CHRISTMAN were going.  CS2 stated that

11   due to OROZCO CRUZ being hyper-paranoid, it was not unusual for him to do drug

12   deals while driving around the block a couple of times.  CS2 also said OROZCO CRUZ

13   was likely driving and at the same time, weighing out the drugs to give to CHRISTMAN.

14   TFO Rob Earick eventually saw TV2 stop back at the deal location near the Sierra.  TFA

15   Pyeatt saw CHRISTMAN get out of TV2 and walk towards the Sierra.  TFO Lance

16   Pearson then saw CHRISTMAN walk over to meet with CS2.  After CHRISTMAN

17   walked away from CS2, Det. Pickrell and I followed CS2 to a neutral location, where

18   CS2 turned over the two ounces of suspected heroin.

19        64.    Later that evening and after OROZCO CRUZ completed what agents

20   believed to have been his drug delivery route, Det. Mike Grall and TFA Jeff Polaczyk

21   waited at **215961 US Hwy 101, Port Angeles, Washington** until they saw OROZCO

22   CRUZ stop at this location.  Det. Grall and TFA Polaczyk waited a while until they

23   determined that OROZCO CRUZ had stopped there for the rest of the night.

24   ***Fourth Controlled Buy from OROZCO CRUZ and CHRISTMAN***

25        65.    The fourth controlled buy took place during the second week of May 2018,

26   in the late evening.  Det. Pickrell and I met CS2 at a pre-determined location.  Under our

27   instruction, CS2 called CHRISTMAN and asked her to coordinate a two-ounce heroin

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  purchase from OROZCO CRUZ.  CHRISTMAN told CS2 to meet where they have met

2  in the past (for the drug transactions described above).

3      66.     Sgt. Kuch, while on surveillance at a separate location, relayed to the other

4  agents on surveillance that he saw TV2 pass the Park and Ride on Highway 101,

5  eastbound towards Port Angeles.  Simultaneously, TFO Chohrach observed the black

6  GMC Sierra enter the area of the agreed upon deal location.  CHRISTMAN got out of the

7  Sierra and walked over to meet with CS2.  Through the EMD I could hear the two

8  counting the buy money.  I also was able to see CHRISTMAN's face at the beginning of

9  the video.  After counting the money, CHRISTMAN asked CS2, "two," referring to the

10  amount of heroin CS2 wanted to purchase.  CHRISTMAN also went on to talk about

11  quantities and prices of drugs.  It sounded like CHRISTMAN and CS2 were concerned

12  about a price increase on the suspected heroin they were obtaining from OROZCO

13  CRUZ.  Additionally, CHRISTMAN told CS2, "I'm gonna look at the scale with him and

14  I'm gonna make sure it's on point."  I believe the person CHRISTMAN referred to as

15  "him" is OROZCO CRUZ.

16      67.     TFO Chohrach then saw CHRISTMAN walk away from CS2 and return to

17  the black GMC Sierra.  The GMC Sierra then moved to a nearby parking lot.  TFO

18  Earick confirmed that Killins was the driver of the GMC Sierra and that CHRISTMAN

19  was the passenger.

20      68.     TFO Hamilton observed CHRISTMAN and Killins exit the black GMC

21  Sierra and head towards a nearby market.  Both CHRISTMAN and Killins entered the

22  store.  About a minute later, TFO Hamilton then saw TV2, driven by OROZCO CRUZ,

23  arrive at the deal location and park near the Sierra.  Subsequently, RAC McKenzie

24  observed CHRISTMAN and Killins return to the black GMC Sierra.  TFOs Chohrach and

25  Antony Nisco then observed CHRISTMAN going to the passenger side of TV2 and

26  getting into the vehicle.  After approximately a minute, RAC McKenzie saw TV2

27  departing the area for what I believe to be for the suspected drug transfer from OROZCO

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  CRUZ to CHRISTMAN (while driving down and around nearby streets, similar to
2  previous surveillance observations).

3      69.    When RAC McKenzie saw TV2 return to the deal location, TFOs Chohrach
4  and Nisco observed CHRISTMAN get out and immediately walk over to CS2.  Through
5  the EMD, I was able to hear and see CHRISTMAN talking to CS2 while weighing out
6  the suspected heroin.  Shortly after giving the suspected drugs to CS2, CHRISTMAN
7  walked away from CS2 and returned to the black Sierra.  Det. Pickrell and I then
8  followed CS2 to a neutral location, where CS2 turned over the two ounces of suspected
9  heroin to Det. Pickrell and me.

10      70.    Later that evening and after OROZCO CRUZ completed what agents
11  believed to have been his drug delivery route, Det. Grall and TFA Polaczyk again waited
12  at **215961 US Hwy 101, Port Angeles, Washington**, until they saw OROZCO CRUZ
13  stop at this location.  Upon seeing OROZCO CRUZ arrive at **215961 US Hwy 101, Port**
14  **Angeles, Washington,** Det. Grall and TFA Polaczyk waited a while until they
15  determined that OROZCO CRUZ had stopped there for the remainder of the night.

16      **V.    TACTICS USED BY DRUG TRAFFICKERS**

17      71.    Based upon my training, experience, and participation in this and other
18  investigations involving narcotics trafficking, my conversations with other experienced
19  agents and law enforcement agents with whom I work, and interviews of individuals who
20  have been involved in the trafficking of methamphetamine, heroin and other narcotics, I
21  have learned and know the following:

22      a.    DTOs often use "stash houses" to conceal their illegal activities and
23  contraband.  Such stash houses allow drug traffickers to keep their contraband at a hidden
24  location, where they may not live, thereby making it more difficult for law enforcement
25  and/or competitors to identify these locations where drugs and drug proceeds may be
26  hidden.

27      b.    It is common for drug dealers to possess narcotics, drug
28  paraphernalia, and other items which are associated with the sale and use of controlled

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1 | substances such as scales, containers, cutting agents and packaging materials in their

2 | residences, stash houses, storage units, garages, outbuildings and/or vehicles on their

3 | property.

4 |       c.    It is common for drug dealers to hide proceeds of illegal narcotics

5 | sales and records of illegal narcotics transactions in secure locations within their

6 | residences, stash houses, storage units, garages, outbuildings and/or vehicles on the

7 | property for their ready access and to conceal them from law enforcement authorities.

8 |       d.    It is common to find papers, letters, billings, documents, and other

9 | writings, which show ownership, dominion, and control of businesses, residences, and/or

10 | vehicles in the residences, stash houses, storage units, garages, outbuildings and/or

11 | vehicles of drug traffickers.  Items of personal property that tend to identify the person(s)

12 | in residence, occupancy, control, or ownership of the premises also include canceled

13 | mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries,

14 | utility and telephone bills, statements, identification documents, keys, financial papers,

15 | rental receipts and property ownership papers, personal and business telephone and

16 | address books and telephone toll records, and other personal papers or identification

17 | cards in the names of subjects involved in the criminal activity being investigated.

18 |       e.    Drug traffickers frequently amass large proceeds from the illegal

19 | sale of controlled substances that they attempt to legitimize.  To accomplish this goal,

20 | drug traffickers use financial institutions and their attendant services, securities, cashier's

21 | checks, safe deposit boxes, money drafts, real estate, shell operations, and business

22 | fronts.  Persons involved in drug trafficking and/or money laundering keep papers

23 | relating to these activities for future reference, including federal and state tax records,

24 | loan records, mortgages, deeds, titles, certificates of ownership, records regarding

25 | investments and securities, safe deposit box rental records and keys, and photographs.  I

26 | know from my training and experience that often items of value are concealed by persons

27 | involved in large scale drug trafficking inside of safes, lock boxes, and other secure

28 | locations within their residences, outbuildings, and vehicles.

1       f.      Drug traffickers very often place assets in names other than their
2   own to avoid detection of these assets by government agencies, and that even though
3   these assets are in other individual or business names, the drug dealers actually own and
4   continue to use these assets and exercise dominion and control over them.

5       g.      Drug traffickers often document aspects of their criminal conduct
6   through photographs or videos of themselves, their associates, their property, and their
7   product.  Drug traffickers usually maintain these photographs or videos in their
8   possession.

9       h.      Drug traffickers often maintain large amounts of United States
10  currency in order to maintain and finance their ongoing illegal drug trafficking business.
11  Often drug traffickers from other countries operating in the United States frequently use
12  wire remitters and bulk cash transfers to transfer currency to co-conspirators living in
13  other countries.

14      i.      Drug traffickers commonly have in their possession, on their person,
15  and at their residences and/or in their storage units, firearms and other weapons which are
16  used to protect and secure a drug trafficker's property.

17      j.      Drug traffickers use mobile electronic devices including cellular
18  telephones and other wireless communication devices for the purpose of conducting their
19  illegal trafficking business.  As described below, such equipment often contains evidence
20  of these illegal activities.

21      k.      Drug traffickers commonly maintain addresses, vehicles, or
22  telephone numbers which reflect names, addresses, vehicles, and/or telephone numbers of
23  their suppliers, customers and associates in the trafficking organization and it is common
24  to find drug traffickers keeping records of said associates in cellular telephones and other
25  electronic devices.  Traffickers often maintain cellular telephones for ready access to
26  their clientele and to maintain their ongoing narcotics business.  Traffickers frequently

27

28

AFFIDAVIT OF SA SAMUEL LANDIS - 25

1  change their cellular telephone numbers to avoid detection by law enforcement, and it is
2  common for traffickers to use more than one cellular telephone at any one time.

3        l.     Drug traffickers use cellular telephones as a tool or instrumentality
4  in committing their criminal activity.  They use them to maintain contact with their
5  suppliers, distributors, and customers.  They prefer cellular telephones because, first, they
6  can be purchased without the location and personal information that land lines require.
7  Second, they can be easily carried to permit the user maximum flexibility in meeting
8  associates, avoiding police surveillance, and traveling to obtain or distribute drugs.
9  Third, they can be passed between members of a drug conspiracy to allow substitution
10  when one member leaves the area temporarily.  Since cellular phone use became
11  widespread, every drug dealer I have interacted with has used one or more cellular
12  telephones for his or her drug business.  I also know that it is common for drug traffickers
13  to retain in their possession phones that they previously used, but have discontinued
14  actively using, for their drug trafficking business.  Based on my training and experience,
15  the data maintained in a cellular telephone used by a drug dealer is evidence of a crime or
16  crimes.  This includes the following:

17        i.     The assigned number to the cellular telephone (known as the
18  mobile directory number or MDN), and the identifying telephone serial number (known
19  as either the Electronic Serial Number (ESN), Mobile Identification Number (MIN),
20  International Mobile Subscriber Identity (IMSI) number, or the International Mobile
21  Equipment Identity (IMEI) number) are important evidence because they reveal the
22  service provider, allow us to obtain subscriber information, and uniquely identify the
23  telephone.  This information can be used to obtain toll records, to identify contacts by this
24  telephone with other cellular telephones used by co-conspirators, to identify other
25  telephones used by the same subscriber or purchased as part of a package, and to confirm
26  if the telephone was contacted by a cooperating source.

27        ii.    The stored list of recent received calls and sent calls is
28  important evidence.  It identifies telephones recently in contact with the telephone user.

AFFIDAVIT OF SA SAMUEL LANDIS - 26

This is valuable information in a drug investigation because it will identify telephones used by other members of the organization, such as suppliers, distributors and customers, and it confirms the date and time of contacts.  If the user is under surveillance, it identifies what number he called during or around the time of a drug transaction or surveilled meeting.  Even if a contact involves a telephone user not part of the conspiracy, the information is helpful (and thus is evidence) because it leads to friends and associates of the user who can identify the user, help locate the user, and provide information about the user.  Identifying a defendant's law-abiding friends is often just as useful as identifying his drug-trafficking associates.

iii.    Stored text messages are important evidence, similar to stored numbers.  Agents can identify both drug associates, and friends of the user who likely have helpful information about the user, his location, and his activities.

iv.    Photographs on a cellular telephone are evidence because they help identify the user, either through his /her picture, or through pictures of friends, family, and associates that can identify the user.  Pictures also identify associates likely to be members of the drug trafficking organization.  Some drug traffickers photograph groups of associates, sometimes posing with weapons and showing identifiable gang signs.  Also, digital photos often have embedded "geocode" information within them. Geocode information is typically the longitude and latitude where the photo was taken. Showing where the photo was taken can have evidentiary value.  This location information is helpful because, for example, it can show where coconspirators meet, where they travel, and where assets might be located

v.    Stored address records are important evidence because they show the user's close associates and family members, and they contain names and nicknames connected to phone numbers that can be used to identify suspects.

72.    It is a common practice for drug traffickers to maintain records relating to their drug trafficking activities in their residences, stash houses, storage units, garages, outbuildings and/or vehicles.  Because drug traffickers in many instances will "front"

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   (that is, sell on consignment) controlled substances to their clients, or alternatively, will

2   be "fronted" these items from their suppliers, such record keeping is necessary to keep

3   track of amounts paid and owed, and such records will also be maintained close at hand

4   so as to readily ascertain current balances.  These records include "pay and owe" records

5   to show balances due for drugs sold in the past (pay) and for payments expected (owe) as

6   to the trafficker's suppliers and distributors, telephone and address listings of clients and

7   suppliers, and records of drug proceeds.  These records are commonly kept for an

8   extended period.

9       73.    Drug traffickers maintain books, records, receipts, notes, ledgers, airline

10   tickets, money orders, and other papers relating to the transportation and distribution of

11   controlled substances.  These documents whether in physical or electronic form, are

12   maintained where the traffickers have ready access to them.  These documents include

13   travel records, receipts, airline tickets, auto rental agreements, invoices, and other

14   memorandum disclosing acquisition of assets and personal or business expenses.  I also

15   know that such records are frequently maintained in narcotics traffickers' residences,

16   stash houses, storage units, garages, outbuildings and/or vehicles.

17   **VI.   CONCLUSION**

18       74.    Based upon the information which has been uncovered during the course of

19   this investigation, including information received from multiple sources of information,

20   four controlled purchases of narcotics (heroin and methamphetamine), physical

21   surveillance, and on the advice, experience, knowledge of other agents and officers

22   involved in this investigation, I believe the two locations more fully described in

23   Attachments A1 and A2 have been used, and will continue to be used, by Nicolas

24   OROZCO CRUZ and his associates to facilitate drug trafficking crimes, money

25   laundering crimes, and related offenses in the Western District of Washington, and

26   elsewhere, in violation of the Controlled Substances Act, Title 21, United States Code,

27   Sections 841(a)(1), 843(b), and 846, and Title 18, United States Code, Sections

28

AFFIDAVIT OF SA SAMUEL LANDIS - 28

1    922(g)(1), 924(c), 1956, and 1957, and that there is probable cause to believe evidence of

2    such, as described more particularly in Attachment B, will be found at these locations.

3

4

5                              _____

6                              SAMUEL LANDIS

                               Special Agent

7                              Drug Enforcement Administration

8        SUBSCRIBED and SWORN TO before me this 22nd day of May, 2018.

9

10

11                             _____

12                              DAVID W. CHRISTEL

                               UNITED STATES MAGISTRATE

13                              JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AFFIDAVIT OF SA SAMUEL LANDIS - 29

## **ATTACHMENT A1**
### Location to be searched

This warrant authorizes the government to search the primary residence of Nicolas OROZCO CRUZ, located at **215961 US Hwy 101, Port Angeles, Washington**, for evidence and/or fruits of the commission of the following crimes:  distribution and possession with intent to distribute controlled substances in violation of Title 21, United States Code, Section 841(a)(1), and conspiracy to commit these offenses in violation of Title 21, United States Code, Section 846; use of a communications facility in furtherance of a felony drug offense in violation of Title 21, United States Code, Section 843(b); felon in possession of a firearm and possession of a firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(c); and laundering of monetary instruments and conspiracy to commit money laundering, in violation of Title 18, United States Code, Sections 1956 and 1957, as further described in Attachment B hereto.

With respect to the location to be searched, the search is to include all rooms within the residence, and any garages or storage rooms within the curtilage of the residence, whether attached or detached, and any vehicles found within such garage, in the driveway, or elsewhere within the curtilage of the residence.  The property is more particularly described as Parcel Number 1030292102751000, an off-white colored, single-story mobile home built in 1977.  On the western side of the residence, there is a small shed-like structure.  Trees and other vegetation cover the view of the structure.  The front door is located directly in the center of the mobile home.  The mobile home is located near mile marker 215 and is on the north side of US Hwy 101.  The two photos on the next page show what the residence looks like and where it is located.

1

## ATTACHMENT A1, cont.

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19



20
21
22
23
24
25
26
27
28

AFFIDAVIT OF SA SAMUEL LANDIS - 31

1

**ATTACHMENT A2**

2       This warrant authorizes the government to search the secondary residence of

3 Nicolas OROZCO CRUZ, located at the **"Welcome Inn RV Park," 1215 US Hwy 101,**

4 **Trailer 101, Port Angeles, Washington**, for evidence and/or fruits of the commission of

5 the following crimes:  distribution and possession with intent to distribute controlled

6 substances in violation of Title 21, United States Code, Section 841(a)(1), and conspiracy

7 to commit these offenses in violation of Title 21, United States Code, Section 846; use of

8 a communications facility in furtherance of a felony drug offense in violation of Title 21,

9 United States Code, Section 843(b); felon in possession of a firearm and possession of a

10 firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States

11 Code, Sections 922(g)(1) and 924(c); and laundering of monetary instruments and

12 conspiracy to commit money laundering, in violation of Title 18, United States Code,

13 Sections 1956 and 1957, as further described in Attachment B hereto.

14       With respect to the location to be searched, the search is to include all rooms

15 within the residence, and any garages or storage rooms within the curtilage of the

16 residence, whether attached or detached, and any vehicles found within such garage, in

17 the driveway, or elsewhere within the curtilage of the residence.  The property is more

18 particularly described as a single-story mobile home with frame siding that is brown in

19 color with a white front door.  The numbers "101" are vertically displayed on a support

20 post near the front steps.  The mobile home is located at the northwest corner of the

21 Welcome Inn RV Park and near the exit of the RV Park which comes out to S. Bean

22 Road, in Port Angeles.  A photo of this residence appears on the next page.

23

24

25

26

27

28

AFFIDAVIT OF SA SAMUEL LANDIS - 32

**ATTACHMENT A2, cont.**



**ATTACHMENT B**
**Items to be seized**

From the locations described in Attachments A1 and A2 of this warrant, as well as from vehicles found within the curtilage of the locations described in Attachments A1 and A2, the government is authorized to search for and seize the following items, which are evidence and/or fruits of the commission of the following crimes:  distribution and possession with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1), and conspiracy to commit these offenses in violation of Title 21, United States Code, Section 846; use of a communications facility in furtherance of a felony drug offense in violation of Title 21, United States Code, Section 843(b); felon in possession of a firearm and possession of a firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(c); and laundering of monetary instruments and conspiracy to commit money laundering, in violation of Title 18, United States Code, Sections 1956 and 1957, including the following:

1.      Any suspected controlled substances, including heroin and methamphetamine;

2.      Firearms and firearms-related items, including magazines, ammunition, holsters, and body armor, or other dangerous weapons;

3.      Cellular telephones and other communications devices including Blackberries, Androids, iPhones, and similar devices, which may be searched only for the following items:

AFFIDAVIT OF SA SAMUEL LANDIS - 34

1        i.      Assigned telephone number and identifying serial number (e.g., ESN,

2                MIN, IMSI, IMEI);

3        ii.     Stored list of recent received, sent, or missed calls;

4        iii.    Stored contact information;

5        iv.    Stored photographs of narcotics, currency, guns or other weapons,

6                suspected criminal activity, and/or the user of the phone or co-

7                conspirators; and

8        v.      Stored text messages that relate to the above-enumerated federal crimes;

9      4.    Financial profits, proceeds and instrumentalities of trafficking in narcotics

10 and money laundering, including U.S. currency and other items of value;

11     5.    Paraphernalia for packaging, smuggling, processing, diluting,

12 manufacturing, weighing, and distributing controlled substances, for example:  hidden

13 compartments, scales, blenders, funnels, sifters, grinders, glass panes, mirrors, razor

14 blades, plastic bags, heat sealing devices, and diluting agents such as inositol, vitamin

15 B12, etc.;

16     6.    Books, records, receipts, notes, ledgers, and other documents relating to the

17 distribution of controlled substances, money laundering, communications between

18 members of the conspiracy, and evidence of the use of apparently legitimate businesses to

19 disguise profits;

20     7.    Photographs, video tapes, digital cameras, and similar items depicting

21 friends and relatives of the property occupants, or suspected buyers or sellers of

22 controlled substances, controlled substances, and assets derived from the distribution of

23 controlled substances;

24     8.    Personal books and papers reflecting names, addresses, telephone numbers,

25 and other contact or identification data relating to the distribution of controlled

26 substances, and money laundering;

27     9.    Financial records relating to controlled substances income and expenditures

28 of money and wealth, to wit:  money orders, wire transfer records, cashier's checks and

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   receipts, bank account records, passbooks, tax records, safe deposit box keys and records,

2   checkbooks, and check registers, as well as precious metals and gems such as gold, silver,

3   diamonds, etc.;

4         10.    Items of personal property that tend to identify the person(s) in residence,

5   occupancy, control, or ownership of the premises and/or vehicle, including canceled mail,

6   deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility

7   and telephone bills, statements, identification documents, and keys;

8         11.    Identification documents, including passports, visas, alien registration

9   cards, any and all travel documents, immigration documents, driver's licenses,

10  identification cards, and social security cards;

11        12.    Documents indicating travel in interstate and foreign commerce, to include

12  airline tickets, notes and travel itineraries; airline schedules; gas receipts, bills; charge

13  card receipts; hotel, motel, and car rental statements; correspondence with travel agencies

14  and other travel related businesses; airline, rent a car, and hotel frequent flier or user

15  cards and statements; passports and visas; telephone bills; photographs of foreign

16  locations; and papers relating to domestic and international travel; and

17        13.    Latent prints and identifying material from items at the residences and

18  vehicles.

19

20

21

22

23

24

25

26

27

28

AFFIDAVIT OF SA SAMUEL LANDIS - 36